# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JULIE FRIEDMAN, derivatively on behalf of TRIPADVISOR, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY B. MAFFEI, STEPHEN KAUFER, SUKHINDER SINGH CASSIDY, JONATHAN F. MILLER, DIPCHAND V. NISHAR, JEREMY PHILIPS, SPENCER M. RASCOFF, CHRISTOPHER W. SHEAN, ROBERT S. WISENTHAL, SETH KALVERT and DARA KHOSROWSHAHI,<br><br>Defendants,<br><br>-and-<br><br>TRIPADVISOR, INC., a Delaware Corporation,<br><br>Nominal Defendant. | C.A. No. 11105-VCMR |

## MEMORANDUM OPINION

Date Submitted: January 13, 2016
Date Decided: April 13, 2016

David A. Jenkins and Neal C. Belgam of SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Steven J. Purcell of LEVI & KORSINSKY LLP, New York, New York; *Attorneys for Plaintiff.*

Kenneth J. Nachbar, Susan W. Waesco, and Thomas P. Will of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Defendants and Nominal Defendant.*

**MONTGOMERY-REEVES, Vice Chancellor.**

The plaintiff's Verified Stockholder Derivative Complaint, brought on behalf of TripAdvisor, Inc., alleges that certain current and former TripAdvisor directors and executives improperly allowed another former TripAdvisor director to retain, and receive immediate vesting of, restricted stock units upon his departure from the board.

Before initiating this lawsuit, the plaintiff demanded that the board investigate the circumstances surrounding the retention and vesting of those restricted stock units and take appropriate action. The board formed a special committee that investigated the allegations and drafted a detailed report that recommended that the board take no action. The board adopted those recommendations and refused the demand. The plaintiff then filed her complaint asserting her original allegations and adding a claim that the board wrongfully refused her demand. In response, the defendants moved to dismiss the complaint under Court of Chancery Rule 23.1, contending that the plaintiff fails to plead particularized facts that raise a reasonable doubt as to whether the board validly exercised its business judgment in refusing the demand. For the reasons stated in this Memorandum Opinion, I grant the motion to dismiss under Rule 23.1.

1

# I. BACKGROUND[1]

## A. Parties

Plaintiff Julie Friedman has been a stockholder of TripAdvisor, Inc. ("TripAdvisor" or the "Company") since December 2011.

Nominal Defendant TripAdvisor is a Delaware corporation with its principal place of business in Newton, Massachusetts. TripAdvisor is a travel advisory firm that offers travel advice and a variety of online travel booking tools. TripAdvisor's websites operate in forty-five countries worldwide.

Defendant Stephen Kaufer co-founded TripAdvisor in 2000 and is the Company's current President and CEO. Kaufer also serves on the Company's board of directors. Defendant Dara Khosrowshahi was a director of TripAdvisor from December 2011 until February 7, 2013. Khosrowshahi has been the CEO of Expedia, Inc. ("Expedia") since August 2005. Defendant Seth Kalvert is TripAdvisor's Senior Vice President and General Counsel. Defendant Gregory B. Maffei has been the Chairman of TripAdvisor's board of directors since February

---

[1] The facts are drawn from the particularized allegations of the plaintiff's Verified Stockholder Derivative Complaint (the "Complaint") and the attachments thereto. "When considering a motion to dismiss under Rule 23.1, this Court affords plaintiffs all reasonable inferences that logically flow from the particularized facts alleged in the complaint." *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 552305, at *4 (Del. Ch. Feb. 29, 2008). Those allegations and inferences, as well as the facts drawn from the documents attached to the Complaint, are assumed true for purposes of this motion to dismiss.

2013 and the President and CEO of Liberty Interactive Corporation ("Liberty") since February 2006.[2]

Defendants Sukhinder Singh Cassidy, Jonathan F. Miller, Jeremy Philips, and Robert S. Wiesenthal have been TripAdvisor directors since December 2011. Defendant Christopher W. Shean has been a TripAdvisor director since February 2013. Defendants Dipchand V. Nishar and Spencer M. Rascoff have been TripAdvisor directors since September 2013.

Kaufer, Maffei, Cassidy, Miller, Philips, Wiesenthal, Shean, Nishar, and Rascoff, collectively, are referred to as the "Board." The Board, Khosrowshahi, and Kalvert, collectively, are referred to as "Defendants."

Non-party Expedia is another company that provides travel-related services and is one of TripAdvisor's "primary competitor[s]."[3] TripAdvisor was a wholly-owned business segment of Expedia's until December 2011.

---

[2]   Liberty held a substantial equity stake in Expedia, but had granted an irrevocable proxy to Barry Diller to vote its shares of Expedia common stock. As a result of Liberty's irrevocable proxy, Diller was Expedia's controlling stockholder. The Complaint does not describe the circumstances surrounding that irrevocable proxy.

[3]   Compl. ¶ 74-75.

3

### B. Facts

#### 1. Expedia grants Khosrowshahi restricted stock units and spins off TripAdvisor into a separate company.

On March 7, 2006, the compensation committee of Expedia's board of directors granted its CEO, Khosrowshahi, restricted stock units ("RSUs") representing 800,000 shares of Expedia common stock. Five years later, in December 2011, Expedia spun off its wholly-owned business segment, TripAdvisor, into a separate company. To effectuate that spin-off, Expedia commenced a one-for-two reverse stock split. When the spin-off was completed on December 20, 2011, Expedia stockholders received one share of Expedia common stock and one share of TripAdvisor common stock for every two shares of Expedia common stock that they previously had owned. As a result, Diller, Expedia's controlling stockholder by virtue of an irrevocable proxy granted to him by Liberty, became TripAdvisor's controlling stockholder as well.

#### 2. TripAdvisor and Khosrowshahi enter into an agreement governing the vesting of the RSUs.

Upon the consummation of the spin-off, Khosrowshahi joined TripAdvisor's board of directors. Further, Khosrowshahi's original award of 800,000 RSUs representing Expedia common stock was bifurcated into 400,000 RSUs

4

representing Expedia common stock[4] and 400,000 RSUs representing TripAdvisor common stock. TripAdvisor and Khosrowshahi then entered into an agreement, dated December 20, 2011, covering the vesting of those 400,000 RSUs (the "RSU Agreement").[5]

The RSU Agreement conditioned the vesting of the RSUs on the achievement of certain performance goals, one of which related to Expedia's stock price and earnings and the other of which related to a target operating income for TripAdvisor (the "Combined Goals").[6] Upon satisfaction of the Combined Goals, 75% of the RSUs would vest immediately. The remaining 25% would vest one year later if Khosrowshahi had not either (1) voluntarily resigned from TripAdvisor's board or (2) been terminated for "Cause."[7]

---

[4]  In 2013, Friedman filed a derivative complaint on Expedia's behalf against Khosrowshahi and Expedia's board regarding the vesting of these 400,000 RSUs of Expedia common stock. This Court dismissed that action under Rule 23.1 for failure to plead demand futility. The Delaware Supreme Court affirmed that dismissal. *See Friedman v. Khosrowshahi*, 2014 WL 3519188 (Del. Ch. July 16, 2014), *aff'd*, 2015 WL 1001009 (Del. Mar. 6, 2015) (TABLE).

[5]  *See* Compl., Ex. 1 [RSU Agreement].

[6]  RSU Agreement § 1(b).

[7]  *Id.* The RSU Agreement defines "Cause" as follows:

> (i) The plea of guilty or nolo contedere to, conviction for, or the commission of, a felony offense by [Khosrowshahi]; (ii) a material breach by [Khosrowshahi] of a fiduciary duty owed to the Corporation; (iii) a material breach by [Khosrowshahi] of any of the covenants made by [Khosrowshahi] in

5

Alternatively, if a "Change in Control" occurred, as defined in the RSU Agreement, then 50% of the RSUs would vest immediately, irrespective of the Combined Goals.[8] The vesting of the remaining 50% of the RSUs, however, depended on whether Khosrowshahi remained with or departed from TripAdvisor's board during the one year following a Change in Control, as well as the circumstances surrounding any such departure. If Khosrowshahi remained employed by TripAdvisor one year after a Change in Control, then the Combined

Paragraph 18 of this Agreement; (iv) the willful or gross neglect by [Khosrowshahi] of the material duties as a director of the Corporation or the Material duties relating to such other Service provided by [Khosrowshahi]; or (v) a knowing and material violation by [Khosrowshahi] of any policy of the Corporation pertaining to ethics, legal compliance, wrong-doing or conflicts of interest that, in the case of the conduct described in clauses (iv) or (v) above, if curable, is not cured by [Khosrowshahi] within 30 days after [Khosrowshahi] is provided with written notice thereof.

*Id.* at 1.

[8] *Id.* § 5(b). The RSU Agreement defines "Change in Control" as including the following:

[T]he termination of the irrevocable proxy held by Barry Diller to vote shares of the Corporation held by Liberty Media Corporation or its affiliates, and the acquisition by Liberty Media Corporation and their respective affiliates of Beneficial Ownership of equity securities of the Corporation whereby Liberty Media Corporation acquires or assumes more than 35% of the voting power of the then outstanding equity securities of the Corporation entitled to vote generally in the election of directors . . . .

*Id.*

6

Goals would have to be satisfied for the remaining RSUs to vest.[9]  If Khosrowshahi was terminated without Cause within one year following the Change in Control, then the other 50% would vest irrespective of the Combined Goals.[10]  And, if Khosrowshahi voluntarily resigned or was terminated for Cause within one year of a Change in Control, then he would forfeit the remaining 50% of the RSUs.[11]

Finally, the RSU Agreement contained a non-compete provision (the "Non-Compete") that restricted Khosrowshahi as follows:

> In consideration of the Corporation's award of Restricted Stock Units, [Khosrowshahi] hereby agrees and covenants that during his Service with the Corporation and its Subsidiaries and Affiliates and for a period of 24 months beyond [Khosrowshahi's] date of termination of Service for any reason (the "Non-Compete Period"), [Khosrowshahi] shall not, directly or indirectly, engage in, assist or become associated with a Competitive Activity.  For purposes of this Agreement, (i) a "Competitive Activity" means, at the time of [Khosrowshahi's] termination of Service, any business or other endeavor, in any jurisdiction, of a kind being conducted by the Corporation or any of its subsidiaries or, if engaged in the provision of any travel related services, any of its subsidiaries or, if engaged in the provision of any travel related services, any of its Affiliates in any jurisdiction (or demonstrably anticipated

---

[9]  *Id.* § 1(b).

[10]  *Id.* § 5(b).

[11]  *Id.* § 1(e).

7

by the Corporation or its Subsidiaries or Affiliates) as of the date hereof or at any time thereafter; and (ii) [Khosrowshahi] shall be considered to have become "associated with a Competitive Activity" if [he] becomes directly or indirectly involved . . . with any individual, partnership, corporation or other organization that is engaged in a Competitive Activity.[12]

The Non-Compete contained a carve-out that specifically exempted Khosrowshahi's service at Expedia from the definition of "Competitive Activity."[13]

### 3. Liberty purchases control of TripAdvisor from Diller.

On December 11, 2012, TripAdvisor and Liberty announced that Liberty and Diller had entered into a transaction whereby Liberty purchased over 4.7 million shares of TripAdvisor common stock from Diller (the "Liberty/Diller Transaction"). Further, under the Liberty/Diller Transaction, Liberty terminated Diller's right to control the vote of the shares of TripAdvisor common stock that Liberty beneficially owned. As a result, the Liberty/Diller Transaction constituted a Change in Control under the RSU Agreement, and 50% of Khosrowshahi's RSUs immediately vested. Thus began the one year period during which the remaining RSUs either would (1) vest if Khosrowshahi was terminated without Cause or (2) be forfeited if Khosrowshahi was terminated for Cause or voluntarily resigned.

[12]     *Id.* § 18.

[13]     *Id.*

8

## 4. Expedia purchases a majority equity stake in Trivago.

On December 21, 2012, Expedia announced that it had entered into an agreement to acquire a 61.6% equity position in trivago GmbH (the "Expedia/Trivago Transaction"). trivago GmbH ("Trivago") is a "hotel metasearch functionality" company headquartered in Düsseldorf, Germany.[14] In its Form 8-K announcing the transaction, Expedia stated that "[t]he deal is anticipated to close during the first half of 2013 pending approval from relevant competition authorities. Post close, the trivago co-founders and management team will continue to operate independently out of trivago's headquarters in Dusseldorf, Germany."[15] Trivago's co-founder, Rolf Schrömgens, also stated that "[Trivago's] passion and focus will remain on independently evolving our comprehensive and individualized hotel search."[16]

According to Friedman, Trivago's independence from Expedia is evidenced by the fact that Expedia plays no role in Trivago's management.[17] In the Shareholders Agreement annexed to Expedia's December 21, 2012 Form 8-K, Malte Siewert, Trivago's co-founder and managing director, and two other Trivago

---

[14]  Compl. ¶ 49.

[15]  *Id.* ¶ 76.

[16]  *Id.*

[17]  *Id.*

9

stockholders are identified as Trivago's "Managing Shareholders."[18] Expedia, on the other hand, is identified as the "Parent Guarantor" and restricted from accessing certain of Trivago's information relating to its customers and business partners.[19] Further, a year after Expedia acquired its stake in Trivago, Siewert issued public statements emphasizing Trivago's operational independence from Expedia.[20]

### 5. Khosrowshahi tenders his resignation from TripAdvisor's board.

On December 21, 2012, the same day that the Expedia/Trivago Transaction was announced, Khosrowshahi emailed Kaufer regarding that transaction. Khosrowshahi's email stated, "[l]et me know if you want me off the [TripAdvisor board]. I'll completely understand . . . I'm figuring out my travel schedule for next year so [sic] figuring out if I have to be in Boston on Feb[ruary] 12 [for a scheduled board meeting] . . . ."[21] On December 24, 2012, Kaufer sent Maffei an email expressing his view that Trivago is "serious competition to the core TripAdvisor value proposition, which may now get even more competitive should

---

[18]    *Id.* ¶ 77.

[19]    *Id.* ¶ 77-78.

[20]    *Id.* ¶ 79.

[21]    Compl., Ex. 2 at TA0002.

Expedia put their reviews on Trivago, and otherwise help them with marketing and distribution."[22] Kaufer's email reiterated that the Expedia/Trivago Transaction, while "a reasonable move for Expedia, . . . is certainly competitive to TripAdvisor" and stated that "it doesn't feel appropriate for anyone to sit on both the Expedia board, as well as the TripAdvisor board."[23]

Although Kaufer's email acknowledged that he previously had wanted Khosrowshahi to remain on TripAdvisor's board, the Expedia/Trivago Transaction changed his outlook. As such, Kaufer suggested that both Khosrowshahi and Diller be replaced as TripAdvisor directors. Kaufer also stated, however, that he was "a little sensitive to having lots of different announcements of people coming on and off" the board and that he was not in a hurry to make those changes.[24] Maffei replied to Kaufer on December 27, 2012, agreeing that "[i]f Expedia is competitive in your view, we should definitely not have [Khosrowshahi] on the board."[25]

---

[22]     *Id.* at TA0001.

[23]     *Id.*

[24]     *Id.*

[25]     *Id.*

11

After not receiving a reply to his first email, Khosrowshahi emailed Kaufer again on January 7, 2013 to solicit a response.[26] Kaufer returned Khosrowshahi's email the next day, apologizing for the delay and indicating that it would be "best if [Khosrowshahi] drop[ped] off the Trip[Advisor] board . . . ."[27] Kaufer explained that although he would "miss [Khosrowshahi's] wisdom and support on the board," he "want[ed] to be really open with the board" and did not feel he could be given the competition between Trivago and TripAdvisor.[28]

Nearly one month later, on February 7, 2013, Kalvert sent Khosrowshahi the following email:

> As discussed, we understand that today you will be tendering at our request your resignation as a member of the TripAdvisor, Inc. Board of Directors, effective immediately. Such termination would constitute a "termination of Service" pursuant to Section 5(b)(i) of the RSU Agreement, dated as of December 20, 2011, between you and the Company, and, as such, the remaining Restricted Stock Units (as defined in the RSU Agreement) shall vest immediately.[29]

---

[26] *Id.* at TA0002 ("Just pinging you on this – let me know . . . Thanks and happy new year.").

[27] *Id.*

[28] *Id.*

[29] *Id.* at TA0003.

12

Two hours later, Khosrowshahi sent an email to Kalvert and Kaufer—who was copied on Kalvert's original email—tendering his resignation from the board.[30]

### 6. Friedman inspects TripAdvisor's books and records and makes a demand on the Board.

On February 12, 2013, TripAdvisor filed a Form 8-K announcing that Khosrowshahi had resigned from the board. The Company's Schedule 14A Proxy statement filed with the SEC on May 13, 2013 reiterated that announcement and further stated that Khosrowshahi's "remaining RSUs . . . were accelerated and became fully vested."[31]

Because she disagreed with Kaufer and Kalvert's decision to accelerate the vesting of Khosrowshahi's remaining 200,000 RSUs (the "Challenged RSUs") upon Khosrowshahi's resignation, Friedman served TripAdvisor with a demand for inspection of books and records pursuant to 8 *Del. C.* § 220 on December 10, 2013. In response, the Company produced the above-referenced emails between Khosrowshahi, Kaufer, Maffei, and Kalvert related to Khosrowshahi's departure from the board (the "Section 220 Documents").

---

[30]    *Id.* ("I hereby tender my resignation as a board member of TripAdvisor. It has been a pleasure working with you and the TripAdvisor team. You've built an amazing company and I look forward to working with you to build our partnership. You can also count on my being a shareholder for many years to come!").

[31]    Compl. ¶ 53.

On March 10, 2014, Friedman sent a seven-page letter to the Board demanding that it investigate claims, initiate legal action, and take necessary and appropriate remedial measures regarding the accelerated vesting of the Challenged RSUs (the "Demand Letter"). In the Demand Letter, Friedman asserted that "[t]he accelerated vesting was in violation of the terms of the RSU agreement between Khosrowshahi and the Company."[32] According to the Demand Letter, Khosrowshahi voluntarily resigned from the board; he was not terminated without Cause. As such, pursuant to the RSU Agreement, Khosrowshahi forfeited the Challenged RSUs, and Kaufer and Kalvert should not have accelerated the vesting of those RSUs.

The Demand Letter, therefore, stated that the "RSUs (or the value thereof) should be returned to the Company."[33] Specifically, Friedman demanded, on TripAdvisor's behalf, that the Board take the following actions:

> 1. Rescind or recall the 200,000 shares of TripAdvisor common stock granted to Khosrowshahi upon his resignation, or seek damages against Kaufer and Kalvert in the amount of the value of the 200,000 shares; and

---

[32] *Id.*, Ex. 3 [Demand Letter], at 1.

[33] Demand Letter at 1.

14

2.  Adopt and implement adequate internal controls and systems at the Company designed to prohibit and prevent a recurrence of the wrongdoing described herein.[34]

### 7. The Board investigates and refuses Friedman's demand.

On March 16, 2015, one year after Friedman sent the Demand Letter, the Board refused her demand. In its letter to Friedman (the "Demand Refusal Letter"), the Board explained that it had established a special committee (the "Special Committee") "to investigate the Demand and report its findings and recommendations to the full Board."[35] The Special Committee employed legal advisors to assist with its investigation. Together, the Special Committee and its legal advisors (1) investigated the factual and legal issues raised in the Demand Letter; (2) reviewed the RSU Agreement, TripAdvisor's governance documents, the Section 220 Documents, both TripAdvisor's and Expedia's public filings, and applicable Delaware law, among other items; and (3) interviewed Khosrowshahi, Maffei, and other TripAdvisor officers, directors, and advisors.[36]

As a result of their investigation, the Special Committee concluded that there was no basis on which to rescind the Challenged RSUs or to seek damages against Kaufer or Kalvert. The Special Committee presented its conclusions to the Board

---

[34] *Id.* at 6.

[35] Compl., Ex.4 [Demand Refusal Letter], at 1.

[36] Demand Refusal Letter at 2.

15

on February 5, 2014, and "the Board accepted the Special Committee's recommendation and . . . determined that no action should be taken in response to" Friedman's demand.[37]

In so concluding, the Special Committee and the Board found that Khosrowshahi had not voluntarily resigned. Rather, they found that Khosrowshahi was terminated without Cause due to the Expedia/Trivago Transaction. And, "[i]n addition to considering the merits of the potential legal claims, the Special Committee (in its recommendation) and the Board (in its decision) considered other factors in determining whether pursuing claims would be in the best interests of the Company."[38] The Special Committee and the Board, therefore, "determined that the possibility the Company would prevail on any claims was remote, while

---

[37]  *Id.* at 1.

[38]  *Id.* at 3 ("For example, if the Company were to seek rescission of the 200,000 shares that vested in connection with Mr. Khosrowshahi's termination, he would have viable claims against the Company for breach of his RSU Agreement, which would impose additional costs on the Company to defend. Likewise, any claims against Messrs. Kaufer and Kalvert would result in the Company incurring not only its own legal fees, but those of Messrs. Kaufer and Kalvert, as both have indemnification and advancement rights under the Company's bylaws and applicable Delaware law. Furthermore, litigation against the Company's executives would likely serve as a distraction from the Company's ongoing, day-to-day operations for an extended period of time.").

16

the likelihood the Company would incur substantial costs with no tangible benefits was high."[39] Thus, the Board refused Friedman's demand.

### C. Procedural History

Friedman filed the Complaint on June 5, 2015. On August 12, 2015, Defendants responded to the Complaint by moving to dismiss under Court of Chancery Rule 23.1 (the "Motion"). The parties submitted briefs supporting and opposing the Motion, and, on January 13, 2016, I held oral argument on the Motion. This Memorandum Opinion contains my rulings on Defendants' Motion.

### D. Parties' Contentions

The Complaint asserts three derivative counts on TripAdvisor's behalf against Defendants. Count I is a claim for breach of fiduciary duty against all Defendants except Khosrowshahi. Count II is a claim for waste of corporate assets against all Defendants except Khosrowshahi. Count III is a claim for unjust enrichment against Khosrowshahi. The Complaint seeks the following relief: (1) a declaration that the accelerated vesting of the Challenged RSUs violated the RSU Agreement; (2) an order directing Khosrowshahi to return the 200,000 Challenged RSUs; (3) damages sustained by the Company as a result of Defendants' wrongdoing, plus pre-judgment and post-judgment interest; (4) equitable and injunctive relief as necessary to restrict the disposition or exercise of the

---

[39] *Id.*

Challenged RSUs; (5) an award of the fees, costs, and expenses Friedman incurred in this action; and (6) such other relief as the Court may deem just and proper.

In addition to its substantive derivative claims, the Complaint asserts that the Board wrongfully refused Friedman's demand.[40] Friedman expands upon this in her brief and argues that the Section 220 Documents unambiguously demonstrate that Khosrowshahi voluntarily resigned from the board. Consequently, Khosrowshahi forfeited the Challenged RSUs under the RSU Agreement, and Kaufer and Kalvert's underlying decision to grant Khosrowshahi the Challenged RSUs despite his voluntary resignation constituted waste. In addition, Friedman dismisses the "other factors" the Board considered regarding the Company's best interests as "vague and unsubstantiated."[41] The Board, therefore, purportedly acted in bad faith by refusing to take the actions requested in Friedman's Demand Letter. As such, Friedman contends that her Complaint should survive Defendants' Motion under Rule 23.1 because she has raised a reasonable doubt that the Board's refusal was a valid exercise of business judgment.

According to Defendants, the Complaint should be dismissed because it fails to plead particularized facts that raise a reasonable doubt that the Board validly exercised its business judgment in refusing Friedman's demand. Defendants argue

---

[40]     *Id.* ¶ 91.

[41]     Pl.'s Answering Br. 43.

18

that by making demand on the Board, Friedman implicitly conceded the Board's independence and disinterestedness with respect to its ability to consider the demand. Friedman, therefore, only can challenge the Board's decision to refuse her demand on the grounds that the investigation of the underlying claims was unreasonable or that the refusal was made in bad faith. Defendants point out that Friedman's Complaint does not challenge the reasonableness of the Board's investigation. And, as to Friedman's argument that the Board acted in bad faith by refusing her demand, Defendants maintain that the Complaint's allegations do not support such a finding. Thus, Defendants contend that Friedman's Complaint should be dismissed under Rule 23.1 because it fails to satisfy that Rule's particularized pleading requirements.

Finally, Friedman's answering brief contains an alternative, cursory request for "leave to amend the Complaint to clarify and supplement the relevant allegations therein."[42] Defendants respond that Friedman's request for leave to amend is procedurally improper and untimely. Defendants contend, therefore, that Friedman's request should be denied under Rule 15(aaa) because she failed to demonstrate that good cause exists on which the Court could find that dismissal of the Complaint with prejudice would be unjust.

---

[42] Pl.'s Answering Br. 46.

19

## II.    ANALYSIS

### A.    Standard of Review

#### 1.    The demand requirement

A stockholder seeking to pursue a derivative claim in this Court must satisfy the demand requirement embodied in Rule 23.1.  Rule 23.1 provides that "[i]n a derivative action . . . the complaint shall . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[43]

The demand requirement flows from a fundamental premise of Delaware corporate law:  "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors . . . ."[44] The phrase "[t]he business and affairs of every corporation" necessarily includes the decision whether to bring litigation on behalf of a corporation.  As this Court has recognized, that decision "is a quintessential exercise of business judgment, involving as it does a complex array of costs (both monetary and otherwise),

---

[43]    Ct. Ch. R. 23.1(a).

[44]    8 *Del. C.* § 141(a).

potential benefits, and the risk of uncertain outcomes."[45]  Hence, a corporation's board of directors should have the initial opportunity to decide whether it must, in the exercise of its fiduciary duties, seek rectification of alleged wrongs.[46]

A plaintiff may satisfy the demand requirement by either (1) making a demand on the board to undertake a corrective action or (2) demonstrating that any such demand would have been futile and, therefore, that the demand is excused.[47] "[A] motion to dismiss under Rule 23.1 is not intended to test the legal sufficiency of the plaintiff's substantive claim.  Rather, its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf."[48]

---

[45]  *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at \*25 (Del. Ch. May 8, 2015), *aff'd*, 2016 WL 341201 (Del. Jan. 28, 2016) (TABLE).

[46]  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("[B]y promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations."), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[47]  *See, e.g.*, *Beam v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004).

[48]  *Levine v. Smith*, 1989 WL 150784, at \*5 (Del. Ch. May 21, 1990), *aff'd*, 591 A.2d 194 (Del. 1991).

21

If a plaintiff, as here, makes a demand on the corporation's board and the board refuses that demand, then the plaintiff must demonstrate that the board wrongfully refused the demand.[49]

## 2. Wrongful demand refusal

The Delaware Supreme Court has held that a plaintiff who makes demand on the board concedes that the board had the requisite independence and disinterest to evaluate the demand objectively.[50] Thus, a board's decision to refuse a plaintiff's demand is afforded the protection of the business judgment rule unless the plaintiff alleges particularized facts that raise a reasonable doubt as to whether the board's decision to refuse the demand was the product of valid business judgment.[51]

---

[49] *Spiegel v. Buntrock*, 571 A.2d 767, 775-76 (Del. 1990).

[50] *Levine*, 591 A.2d at 212 ("A shareholder plaintiff, by making demand upon a board before filing suit, tacitly concedes the independence of a majority of the board to respond." (internal quotation marks omitted)), *overruled on other grounds by Brehm*, 746 A.2d 244.

[51] *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996) , *overruled on other grounds by Brehm*, 746 A.2d 244. "Reasonable doubt can be said to mean that there is a reason to doubt." *Id.* "Stated obversely, the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule." *Id.* n.17. In *Ironworkers*, Vice Chancellor Glasscock uses the term "reasonable inference" rather than "reasonable belief" when referring to the obverse of "reasonable doubt." *See, e.g.*, 2015 WL 2270673, at *26 n.255 ("[F]ailure to conduct a thorough investigation could, if sufficiently egregious, support a reasonable inference of gross negligence.").

22

In assessing whether the board's decision to refuse demand was the product of valid business judgment, "the only issues to be examined [by the Court] are the good faith and reasonableness of [the board's] investigation."[52] This Court recently restated the standard a plaintiff claiming wrongful refusal faces:

> [T]o survive a motion to dismiss under Rule 23.1 where demand has been made and refused, a plaintiff must allege particularized facts that raise a reasonable doubt that (1) the board's decision to deny the demand was consistent with its duty of care to act on an informed basis, that is, was not grossly negligent; or (2) the board acted in good faith, consistent with its duty of loyalty. Otherwise, the decision of the board is entitled to deference as a valid exercise of its business judgment.[53]

Further, because Rule 23.1 requires that a derivative complaint's allegations be pled with particularity, "'[v]ague or conclusory allegations do not suffice,' and this Court 'need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.'"[54]

### B. The Board Did Not Wrongfully Refuse Friedman's Demand.

Friedman's opposition to the Motion largely focuses on arguing that, under the Section 220 Documents and the RSU Agreement, the Board incorrectly

---

[52] *Id.*

[53] *Ironworkers*, 2015 WL 2270673, at *24.

[54] *Id.* at *25 (quoting *Postorivo*, 2008 WL 553205, at *4; *Higher Educ. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325, at *5 (Del. Ch. Nov. 3, 2014)).

23

determined that Khosrowshahi was entitled to the Challenged RSUs. In her answering brief, for instance, Friedman states that "Defendants' attempt to dismiss the Complaint hinges on their claim that Khosrowshahi's resignation from TripAdvisor's board was involuntary."[55] That argument, however, is flawed. As Vice Chancellor Glasscock pointed out in *Ironworkers District Council of Philadelphia & Vicinity Retirement & Pension Plan v. Andreotti*, "[i]t is clear that mere disagreement with the Committee's ultimate conclusion, as well as its subsidiary conclusions leading thereto, will be insufficient to raise a reasonable doubt that the Board acted in good faith and on an informed basis."[56]

The Special Committee's finding that there was "no evidence demonstrating that Mr. Khosrowshahi voluntarily resigned from the Company"—as well as the other factors the Board considered, including the projected costs and benefits from pursuing Friedman's claims—served as the basis on which the Board refused Friedman's demand.[57] Defendants' Motion, on the other hand, hinges on whether the Board's decision to refuse Friedman's demand was a valid exercise of business judgment. That latter determination—*i.e.*, whether the Board validly exercised its business judgment in refusing Friedman's demand—depends on the underlying

---

[55]    Pl.'s Answering Br. 24.

[56]    2015 WL 2270673, at *27.

[57]    Demand Refusal Letter at 2.

merits of the Board's decision only for purposes of ascertaining whether the Board's decision was "so inexplicable that a court may reasonably infer that the directors must have been acting for a purpose unaligned with the best interest of the corporation; that is, in bad faith."[58] It was not. As such, Friedman has failed to raise a reasonable doubt as to whether the Board refused her demand in good faith. In addition, Friedman failed to make particularized allegations that would raise a doubt about the reasonableness of the Board's investigation.

### 1. Friedman has not raised a reasonable doubt as to whether the Board complied with its duty of care.

Friedman's brief in opposition to the Motion contains few, if any, arguments regarding the reasonableness of the Board's investigation into her Demand Letter's claims.[59] That alone may suffice for the Court to conclude that Friedman has not raised a reasonable doubt as to whether the Board complied with its duty of care in refusing her demand.[60] Nevertheless, a more searching review of the Complaint reveals that Friedman has not carried her burden of demonstrating that the Complaint's particularized allegations raise a reasonable doubt that the Board was not grossly negligent in refusing her demand.

---

[58] *Ironworkers*, 2015 WL 2270673, at *26.

[59] *See* Pl.'s Answering Br.

[60] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

25

### a. Legal standard for finding gross negligence

A board's compliance with its duty of care is measured by the standard of gross negligence.[61] The "gross negligence" inquiry focuses on whether the directors considered "all material information reasonably available to them."[62] As the Delaware Supreme Court recently stated, "[t]he burden to plead gross negligence is a difficult one, particularly when . . . the committee did a time-consuming investigation with the advice of its own advisors, and prepared a detailed written report of its investigation."[63]

### b. Friedman has failed to raise a reasonable doubt that the Board was not grossly negligent in refusing her demand.

This Court examines the reasonableness of a board's investigation to determine whether that board was grossly negligent in refusing a stockholder's demand. Here, the Demand Refusal Letter describes the Board's investigation. Although the Special Committee generated a more thorough report to present the findings of its investigation to the Board, Friedman's counsel explained at oral

---

[61] *Espinoza v. Dimon*, 124 A.3d 33, 37 (Del. 2015).

[62] *Aronson*, 473 A.2d at 812; *Mount Moriah Cemetery v. Moritz*, 1991 WL 50149, at *4 (Del. Ch. Apr. 4, 1991).

[63] *Espinoza*, 124 A.2d at *36.

argument that Friedman did not request that report because the Demand Refusal Letter sufficiently described the Board's investigation process.[64]

The Demand Refusal Letter details a reasonable process: (1) the Board formed the Special Committee to investigate the claims in Friedman's Demand Letter; (2) the Special Committee engaged a competent and reputable legal advisor to assist with its investigation; (3) the Special Committee and its legal advisor investigated the factual and legal issues raised in the Demand Letter; (4) the Special Committee and its legal advisor reviewed the RSU Agreement, TripAdvisor's governance documents, the Section 220 Documents, both TripAdvisor's and Expedia's public filings, and applicable Delaware law, among other items; (5) the Special Committee and its legal advisor interviewed Khosrowshahi, Maffei, and other TripAdvisor officers, directors, and advisors; (6) the Special Committee reported its findings to the Board and recommended that the Board refuse Friedman's demand; and (7) the Board gave "careful

---

[64] Oral Arg. Tr. 29-30 ("The reason we did not ask for the report or anything -- or make a second [Section] 220 demand after we got the refusal is very simple. It is because we were told exactly what the board did, exactly what the board concluded, and exactly why they reached those conclusions [in the Demand Refusal Letter]. . . . So it was entirely unnecessary based on the record that we had at that time to ask for anything further.").

27

consideration" to the results of the Special Committee's investigation and agreed with the Special Committee's recommendation as to Friedman's demand.[65]

Because these facts indicate that the Board, through the Special Committee, informed itself of material information reasonably available to it, and because the Complaint is devoid of any particularized allegations to the contrary, Friedman has failed to raise a reasonable doubt that the Board was not grossly negligent in refusing her demand.

**2.      Friedman has not raised a reasonable doubt as to whether the Board complied with its duty of loyalty.**

Friedman devotes much of her Complaint and brief to convincing the Court that, under the RSU Agreement and applicable case law, the Company should not have accelerated the vesting of the Challenged RSUs upon Khosrowshahi's departure from the Company. On a motion to dismiss for wrongful demand refusal under Rule 23.1, the Court's analysis centers on a board's decision to refuse a stockholder's demand. The Court only considers a complaint's underlying claims for a narrow purpose—to determine whether the merits of those claims are so overwhelmingly obvious that the board's decision not to pursue them must have been made in bad faith.[66]

---

[65]     Demand Refusal Letter at 1-2.

[66]     *See In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007) ("It is not enough for a shareholder merely to plead facts sufficient to raise an inference

28

Under that standard, Friedman has not carried her burden of demonstrating that the Complaint's particularized allegations raise a reasonable doubt as to the Board's good faith in refusing her demand.

### a. Legal standard for finding bad faith

Because a plaintiff concedes a board's independence and disinterest by making a demand, the board can only breach its duty of loyalty by acting in bad faith.[67] In *In re Walt Disney Co. Derivative Litigation*, the Delaware Supreme Court described the standard for bad faith as follows:

> A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[68]

Even if "the majority of the directors were disinterested and independent, the presumptive validity of the business judgment rule can be rebutted 'where the decision under attack is so far beyond the bounds of reasonable judgment that it

---

that the board of directors *would* refuse a demand. A court should not intervene unless that shareholder raises the more troubling inference that the refusal itself would not be a good faith exercise of business judgment.").

[67]     *Levine*, 591 A.2d at 205-06.

[68]     906 A.2d 27, 67 (Del. 2006) (quoting *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005)).

seems essentially inexplicable on any ground other than bad faith.'"[69]  Yet, "[f]or the actions of directors to have been in bad faith, the directors must have acted with scienter, *i.e.,* with a motive to harm, or with indifference to harm that will necessarily result from the challenged decision—here, that decision being rejection of the Plaintiff's demand."[70]

"Demonstrating that directors have breached their duty of loyalty by acting in bad faith goes far beyond showing a questionable or debatable decision on their part."[71]  In the demand refusal context, a board acts in bad faith if it "intentionally act[s] in disregard of the Company's best interests in deciding not to pursue the litigation the Plaintiff demanded."[72]  Finally, the Court takes into account not only the defendants' countervailing legal arguments, but also the other relevant factors considered by the board—*e.g.*, whether the costs of pursuing the claims outweigh the expected recovery.[73]  "A board may in good faith refuse a shareholder demand

---

[69]  *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000) (internal quotation marks omitted) (quoting *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1247 (Del. 1999)); *see also Levine*, 591 A.2d at 207 ("If a board's decision can be 'attributed to any rational business purpose,' a court will not substitute its judgment for that of a board." (citation omitted) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)); *Ironworkers*, 2015 WL 2270673, at *26.

[70]  *Ironworkers*, 2015 WL 2270673, at *27.

[71]  *Id.*

[72]  *Id.* at *32.

[73]  *infoUSA, Inc.*, 953 A.2d at 986.

30

to begin litigation even if there is substantial basis to conclude that the lawsuit would eventually be successful on the merits" because the board may consider, in the exercise of its business judgment, whether it "would be excessively costly to the corporation or harm its long-term strategic interests."[74]

### b. Friedman has not raised a reasonable doubt as to whether the Board refused her demand in good faith.

The Complaint asserts three separate Counts against Defendants,[75] each of which is contingent on a finding that Khosrowshahi was not entitled to the Challenged RSUs upon his departure from the Company. As such, Friedman's brief does not argue that the Board acted in bad faith as to each of the individual claims. Rather, Friedman's position is that Khosrowshahi was not entitled to the Challenged RSUs under the RSU Agreement and, therefore, "[t]he Board's refusal of the Demand was wrongful because the transaction that gave rise to the Demand was a waste of corporate assets . . . ."[76]

Specifically, Friedman argues that Khosrowshahi voluntarily resigned from TripAdvisor's board. Alternatively, Friedman argues that if Khosrowshahi did not

---

[74] *Id.*

[75] As described above, the Complaint asserts claims for, (1) breach of fiduciary duty against all Defendants except Khosrowshahi, (2) waste of corporate assets against all Defendants except Khosrowshahi, and (3) unjust enrichment against Khosrowshahi. *See supra* Section I.D.

[76] Pl.'s Answering Br. 38.

voluntarily resign, then he was terminated for Cause.[77] Conversely, the Board and the Special Committee concluded that Khosrowshahi was terminated without Cause. Both parties agree that, under the RSU Agreement, Khosrowshahi would forfeit the Challenged RSUs if he either voluntarily resigned or was terminated for Cause. In order to find that the Board wrongfully refused Friedman's demand, Friedman must sufficiently allege that the Board's decision not to pursue her claims was "so inexplicable that a court may reasonably infer that the directors must have been acting for a purpose unaligned with the best interest of the corporation; that is, in bad faith."[78] Friedman has not raised a reasonable doubt as to whether the Board refused her demand in good faith. To the contrary, the Section 220 Documents and the other factors that the Board considered support its decision to refuse Friedman's demand.

### i. Voluntary resignation

Friedman first asserts that the Section 220 Documents reveal that Khosrowshahi voluntarily resigned from TripAdvisor. According to Friedman, Khosrowshahi saw the consummation of the Liberty/Diller Transaction—which

---

[77]   Oral Arg. Tr. 33 ("[Friedman's] position is very simple. The essential point is that . . . based on the particularized allegations of this complaint, [Khosrowshahi's] departure from the TripAdvisor board was either voluntary or it was a termination of service for cause . . . .").

[78]   *Ironworkers*, 2015 WL 2270673, at *26.

constituted a Change in Control under the RSU Agreement—as an opportunity to vest his remaining RSUs immediately and without reference to the Combined Goals. In order to capitalize on that opportunity, Khosrowshahi reached out to Kaufer, with whom he allegedly had a friendly relationship, and initiated his resignation "[a] mere ten days after the Liberty/Diller Transaction."[79] When Kaufer did not respond, Khosrowshahi "ping[ed]" him again a few weeks later.[80] Friedman asserts that "this is not the behavior of someone who would prefer not to leave or is even indifferent about staying put."[81] Friedman maintains that Khosrowshahi's behavior demonstrates that he "had a 'conscious intention' to leave," his resignation was "a result of [his] own personal choice," and he resigned on "'[his] own motion,' as opposed to being discharged."[82] As such, Friedman claims Khosrowshahi's resignation was voluntary.

Although Khosrowshahi ultimately resigned, the Section 220 Documents imply that he did not do so voluntarily. The Section 220 Documents indicate that

---

[79]    Pl.'s Answering Br. 25 & n.4 ("Insofar as the email exchanges between Khosrowshahi and Kaufer suggest a friendly relationship, it appears that Khosrowshahi had tactical reasons for choosing Kaufer as the person he would reach out to in order to make his way off the Board.").

[80]    Compl., Ex. 2 at TA0002.

[81]    Pl.'s Answering Br. 25 (internal quotation marks omitted).

[82]    *Id.* at 26 (quoting *Woodall v. Bayhealth Med. Ctr.*, 2000 WL 973082, at *3 (Del. Super. Apr. 28, 2000); *Andress v. F. Schumacher & Co.*, 1993 WL 542062, at *3 (Del. Super. Nov. 3, 1993)).

33

the decision of whether Khosrowshahi should be removed from the board was always in the hands of the Company and Liberty—TripAdvisor's controlling stockholder—and that shortly after the Expedia/Trivago Transaction, Khosrowshahi recognized the potential conflict and reached out to Kaufer to inquire whether he wanted Khosrowshahi off the board. Kaufer—TripAdvisor's co-founder, president, and CEO—and Maffei—the Board's Chairman and Liberty's President and CEO—then conferred and decided that Khosrowshahi should be removed from the board.[83] Kaufer and Kalvert's emails to Khosrowshahi provide further evidence that the Company made the decision to remove Khosrowshahi from the board. In his email, Kaufer states, "I think it is best if you drop off the Trip[Advisor] board."[84] Similarly, Kalvert notes "that today you will be tendering at our request your resignation."[85]

Friedman rejects the "assertion that Khosrowshahi was 'forced' off the Board."[86] According to Friedman, Delaware law requires "either 'an ultimatum

---

[83]    Compl., Ex. 2 at TA0001.

[84]    *Id.* at TA0002.

[85]    *Id.* at TA0003.

[86]    Pl.'s Answering Br. 27-29. Separately, Friedman points out that because the Non-Compete in the RSU Agreement explicitly exempts Khosrowshahi's employment with Expedia from being considered a conflict, he could not have been forced to resign on that basis. *Id.* at 29-31. Friedman, therefore, describes the Expedia/Trivago Transaction as a pretextual basis on which Khosrowshahi

with regard to the employment' or 'poor working conditions' as a predicate to a finding of a non-voluntary [resignation],"[87] neither of which were present here. Further, even if Khosrowshahi had been given an ultimatum, Friedman contends that Khosrowshahi's actions do not indicate that he resigned involuntarily because he "did not 'stand pat and fight'" that resignation.[88]

Despite the absence of an explicit ultimatum to resign, however, Liberty had the power to remove Khosrowshahi from the board at any time and for any reason under TripAdvisor's bylaws.[89] Other Delaware cases have "held that when an individual is presented with an option to resign or face imminent termination and

---

resigned and states that the Board was not, and should not have been, concerned about Khosrowshahi's conflict. *Id.* The conversation between Kaufer and Maffei in the Section 220 Documents, however, directly contradicts Friedman's contention that they were not concerned about the Expedia/Trivago Transaction. Compl., Ex. 2 at TA0001. Further, I address the Non-Compete in more detail in the context of whether Khosrowshahi was terminated for Cause. *See infra* Section II.B.2.b.ii.

[87] *Id.* at 27-28 (quoting *Ingleside Homes, Inc. v. Gladden*, 2003 WL 22048205, at *8 (Del. Super. Aug. 27, 2003)) (citing *Anchor Motor Freight, Inc. v. Unemployment Ins. Appeal Bd.*, 325 A.2d 374 (Del. Super. 1974)).

[88] *Id.* at 33 (quoting *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995)) (citing *Christie v. United States*, 518 F.2d 584, 587 (Ct. Cl. 1975)).

[89] Defs.' Opening Br., Ex. A, Art. III § 2 ("Any director or the entire Board of Directors may at any time be removed effective immediately, with or without cause, by the vote, either in person or represented by proxy, of a majority of the voting power of shares of stock issued and outstanding . . . .").

chooses to resign, the forced resignation is a non-voluntary termination."[90] And, the cases that Friedman cites for the proposition that Khosrowshahi must have resisted termination in order for his resignation to be involuntary arguably are inapposite. In each of those cases, the court found that the employee had resigned voluntarily after choosing resignation over fighting the employer's purported "for cause" termination.[91] In this case, however, Khosrowshahi never was threatened with termination for Cause and, therefore, never faced a similar choice.

Even if I were to credit Friedman's interpretation of the Section 220 Documents as the most reasonable interpretation, that would not suffice to find the Board had wrongfully refused her demand. "[T]he pertinent 'reason to doubt' is *not* doubt about the propriety of the underlying conduct, nor is it doubt about

---

[90] *See Thompkins v. Franciscan Elder Care*, 2008 WL 2602171, at \*2 (Del. Super. June 27, 2008) (finding that an employee was "constructively discharged" where he "was given the choice of resigning as opposed to being terminated" and chose to resign); *Kaminski v. Ann Taylor Loft*, 2000 WL 33114360, at \*3 (Del. Super. Oct. 27, 2000) (noting that "a constructive discharge by the employer" occurs if an employee is "given only the option of resigning or facing imminent termination").

[91] *See Hargray*, 57 F.3d at 1568 ("[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges. Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because the fact remains that plaintiff *had a choice*. [Plaintiff] could stand pat and fight." (citations omitted) (internal quotation marks omitted)); *Christie*, 518 F.2d at 587 ("While it is possible plaintiff, herself, perceived no viable alternative but to tender her resignation . . . plaintiff chose to resign and accept discontinued service retirement rather than challenge the validity of her proposed discharge for cause.").

36

whether the Board, in rejecting the demand, made a wise decision; it is doubt whether the Board's action, wise or foolish, *was taken in good faith . . . .*"[92] Friedman has failed to raise a reasonable doubt as to whether the Board refused her demand in good faith.

### ii. Termination for Cause

Friedman's alternative argument is that if Khosrowshahi did not resign voluntarily and if the Expedia/Trivago Transaction was the true impetus for Khosrowshahi's departure from the board, then he must have been terminated for Cause.[93] According to Friedman, the Expedia/Trivago Transaction "fundamentally changed the nature of the relationship between TripAdvisor and Expedia" such that (1) the Board thought it prudent for Khosrowshahi to resign and (2) Khosrowshahi's service as Expedia's CEO no longer was exempted from constituting Competitive Activity under the Non-Compete.[94] As Expedia's CEO, it is reasonable to infer that Khosrowshahi played a significant role in that transaction.[95] As a result, Friedman argues that Khosrowshahi engaged in a

---

[92]     *Ironworkers*, 2015 WL 2270673, at *26.

[93]     Compl. ¶ 90; Oral Arg. Tr. 44 ("Assuming this conflict of interest was the reason that not only [Khosrowshahi] left but that he had to leave, that is a for-cause termination of service under the plain terms of the [RSU Agreement].").

[94]     Oral Arg. Tr. 46.

[95]     *Id.* at 46-47.

Competitive Activity by facilitating the Expedia/Trivago Transaction in violation of the Non-Compete, and, thus, he was terminated for Cause.[96]

It is important to note, however, that the Non-Compete only exempts Khosrowshahi's employment with Expedia from being considered a Competitive Activity under the RSU Agreement.[97] The Non-Compete does not appear to inhibit Liberty's ability to remove Khosrowshahi from the board.[98] It was reasonable, therefore, for the Board to have concluded that although the Expedia/Trivago Transaction created a conflict between Expedia and TripAdvisor such that it was prudent to remove Khosrowshahi as a director, that transaction could not have constituted Competitive Activity under the Non-Compete because it explicitly was exempted by the carve-out. In other words, the Company and Liberty may have had good "cause," from a competitive standpoint, to remove Khosrowshahi from the board, but the carve-out for Khosrowshahi's employment

---

[96] At oral argument, Friedman's counsel also implied that Khosrowshahi may have been terminated for Cause for violating one of the Company's policies regarding ethics or conflicts of interest. *See* Oral Arg. Tr. 45. The Complaint's allegations, however, are limited to assertions that Khosrowshahi was terminated for Cause for violating the Non-Compete. Compl. ¶¶ 87-90. The Complaint is devoid of any allegations that Khosrowshahi violated one of TripAdvisor's policies regarding ethics or conflicts of interest. Because of the absence of any such particularized allegations, therefore, I will not consider this portion of Friedman's counsel's argument. *Ironworkers*, 2015 WL 2270673, at *25.

[97] RSU Agreement § 18; Defs.' Opening Br. 27.

[98] *See supra* note 89 and accompanying text.

38

with Expedia in the Non-Compete may have prevented them from terminating him for Cause, as defined in the RSU Agreement.

Friedman has failed to raise a reasonable doubt as to whether the Board refused her demand in good faith by concluding that Khosrowshahi was not terminated for Cause. "The question is not whether the [Board's] conclusion was wrong; the question is whether the Board . . . intentionally acted in disregard of the Company's best interests in deciding not to pursue the litigation the Plaintiff demanded."[99] Thus, the fact that the Board's justifications for refusing Friedman's demand fall within "the bounds of reasonable judgment" is fatal to Friedman's claim that the refusal was made in bad faith.[100]

### iii. Other factors

In addition to its disagreement with the Demand Letter's substantive claims, the Board based its refusal of Friedman's demand on other factors that bear on TripAdvisor's best interests. Those factors include the costs that TripAdvisor would incur (1) defending a potential claim brought by Khosrowshahi for breach of the RSU Agreement in response to the Company seeking rescission of the

---

[99] *Ironworkers*, 2015 WL 2770673, at *32.

[100] *Crescent/Mach I P'rs, L.P.*, 846 A.2d at 981; *see also Ironworkers*, 2015 WL 2270673, at *32 ("[A] disagreement, however vehement, with the *conclusion* of an independent and adequately represented committee is not the same as pleading particularized facts that create a reasonable doubt that the Board acted in what it perceived as the best interests of the corporation.").

Challenged RSUs, (2) prosecuting claims against Kaufer and Kalvert and satisfying their "indemnification and advancement rights under the Company's bylaws and applicable Delaware law," and (3) dealing with the "distraction from the Company's ongoing, day-to-day operations for an extended period time" that would result from "litigation against the Company's executives."[101]

Friedman counters that the Court should ignore those factors in evaluating the Motion because they allegedly "are contradicted by common sense or otherwise vague and entirely unsubstantiated."[102] In so arguing, Friedman cites to *City of Orlando Police Pension Fund v. Page* for the proposition that "[a] demand refusal is not insulated from judicial scrutiny merely because the board said it acted appropriately and made a decision in the company's best interests."[103] Rather, as the court in *Page* recognized, the Board must identify and substantiate the factors that align its demand refusal with the Company's best interests.[104]

---

[101] Demand Refusal Letter at 3.

[102] Pl.'s Answering Br. 44.

[103] *Id.* at 43 (citing 970 F. Supp. 2d 1022 (N.D. Cal. 2013)).

[104] 970 F. Supp. 2d at 1031 ("It may be true that pursuing litigation was not in [the company's] best interests, and that demand was properly refused. However, the [demand refusal letter] merely recites the conclusion that refusal was proper without explaining how the committee reached that conclusion.").

Friedman's argument, however, is belied by the plain language of the Demand Refusal Letter. Far from vague, the Demand Refusal Letter explicitly describes the additional costs that the Board weighed against the potential benefits of pursuing Friedman's claims. And, although Friedman speculates "that certain expenses might not run to the Company, but to the insurance carriers who issued policies concerning the conduct of TripAdvisor's directors and officers," some of those costs may not be insurable at all—*e.g.*, the operational disruptions that the Company would face by litigating against its own executives. It is a stretch, therefore, to characterize the Board's consideration of those factors as "contradicted by common sense."[105]

Further, to the extent Friedman complains that the Demand Refusal Letter is conclusory and lacks sufficiently detailed analyses, Friedman's counsel acknowledged at oral argument that she could have made a demand for the Special Committee's underlying, comprehensive report under 8 *Del. C.* § 220. Yet, Friedman chose not to seek that report because she was satisfied with the Demand Refusal Letter's account of the Board's decision to refuse her demand.[106] Friedman's argument regarding the absence of detailed analyses in the Board's Demand Refusal Letter might have more force had she demanded the Special

---

[105]    Pl.'s Answering Br. 44.

[106]    *See supra* note 64.

41

Committee's report. Instead, Friedman knowingly avoided accessing that source of potentially valuable information.[107]

## C. Friedman May Not Amend the Complaint Under Rule 15(aaa).

Because I concluded above that the Complaint should be dismissed under Rule 23.1, the last issue for consideration is whether that dismissal shall be with or without prejudice as to Friedman's ability to amend her Complaint. Under Rule 15(aaa):

> [A] party that wishes to respond to a motion to dismiss under Rules 12(b)(6) or 23.1 by amending its pleading must file an amended complaint, or a motion to amend in conformity with this Rule, no later than the time such party's answering brief in response to either of the foregoing motions is due to be filed. In the event a party fails to timely file an amended complaint or motion to amend under this subsection (aaa) and the Court thereafter concludes that the complaint should be dismissed under Rule 12(b)(6) or 23.1, such dismissal shall be with prejudice (and in the case of complaints brought pursuant to Rules 23 or 23.1 with prejudice to the named plaintiffs only) unless the Court, for good

---

[107] The fact that Friedman chose not seek the Special Committee's report serves as a basis on which to distinguish *Page* from this case. In *Page*, the United States District Court for the Northern District of California relied heavily on both the defendant-board's failure to provide its report and the conclusory nature of its demand refusal letter in finding that the board had wrongfully refused the plaintiff's demand. 970 F. Supp. 2d at 1030-32. In this case, however, Friedman could have demanded the Special Committee's report, but instead chose to rely solely on the Demand Refusal Letter which, as noted *supra*, is not "conclusory."

cause shown, shall find that dismissal with prejudice would not be just under all the circumstances.[108]

Friedman did not file an amended complaint or a motion to amend the Complaint. In her answering brief, Friedman "requests leave to amend the Complaint to clarify and supplement the relevant allegations therein,"[109] but she does not provide any justification—let alone "good cause"—supporting a finding that dismissal with prejudice would be unjust under these circumstances. The Complaint, therefore, is dismissed with prejudice under Rule 15(aaa). Friedman may not amend the Complaint.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion is granted, and the Complaint is dismissed with prejudice.

**IT IS SO ORDERED**.

---

[108]    Ct. Ch. R. 15(aaa).

[109]    Pl.'s Answering Br. 46.

43